BANNASCH *v.* BARTHOLOMEW.

1. APPEAL AND ERROR—CHANCERY CASES—DE NOVO REVIEW—RECORD.
    An equity suit to set aside documents whereby accounts in savings
    and loan associations were transferred to the name of defend-
    ant and plaintiff's decedent, then an elderly person in ill
    health, being a chancery case, is heard by the Supreme Court
    *de novo* on the record made in the trial court.

2. JOINT TENANCY—SAVINGS AND LOAN ASSOCIATIONS—SURVIVORSHIP
    —MENTAL COMPETENCY.
    Plaintiff, special administrator of the estate of lady 87 years
    of age at time of her death, suing to set aside instruments
    whereby defendant nephew of decedent had been made nominal
    owner of savings and loan account as survivor of himself and
    his aunt, *held*, entitled to relief under evidence presented,
    where it appears that at time instruments were executed some
    3–1/2 months prior to death of the aunt, she was mentally
    incompetent to engage in business transactions affecting her
    property rights.

3. SAME—SAVINGS AND LOAN ASSOCIATION—SURVIVORSHIP—MENTAL
    COMPETENCY—PURPOSE OF CREATION.
    Plaintiff, as special administrator of the estate of a lady who
    was 87 years of age at time of her death, was entitled to
    balance of an account in a savings and loan association
    which represented money that had been transferred thereto
    at time she went to live with defendant nephew, who had
    been designated as joint owner of the account, where it appears
    that at the time of transfer, some 4–1/2 months prior to her
    death, the aunt was mentally incompetent to engage in busi-
    ness transactions affecting her property rights and defendant
    understood the transfer was effected to facilitate payment of
    bills on her behalf.

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error § 815.
[2, 3] 21 Am Jur, Executors and Administrators §§ 904, 908.
[4] 58 Am Jur, Witnesses § 300.
[5] 58 Am Jur, Witnesses § 281 *et seq.*

4. WITNESSES—MATTERS EQUALLY WITHIN KNOWLEDGE OF DECEASED
    —EXECUTORS AND ADMINISTRATORS.

   The statute rendering incompetent the testimony by an opposite
       party in a suit if the subject matter of the testimony was
       equally within the knowledge of a deceased person in whose
       behalf the suit is prosecuted or defended does not bar the
       testimony of a personal representative of the estate in behalf
       of the estate as to matters equally within the knowledge of
       the deceased, since he is not an opposite party (CL 1948,
       § 617.65).

5. SAME—MATTERS EQUALLY WITHIN THE KNOWLEDGE OF DECEASED
    —OPPOSITE PARTY.

   An opposite party, within the meaning of statute barring testi-
       mony by an opposite party that is equally within the knowledge
       of a deceased person, is one whose personal and financial
       interests, either immediate or remote, are antagonistic to the
       like interests of the protected party (CL 1948, § 617.65).

Appeal from Jackson; Boardman (H. D.), J. Sub-
mitted October 16, 1957. (Docket No. 73, Calendar
No. 47,060.) Decided December 24, 1957.

Bill by John W. Bannasch, special administrator
of the estate of Emma J. Allison, deceased, against
Henry Kenneth Bartholomew, Sr., First Federal
Savings & Loan Association of Jackson, Michigan,
and Security Savings & Loan Association of Jack-
son, Michigan, to obtain for the estate certain funds
in respect to which joint accounts had been created
shortly before death. Decree for plaintiff. Defend-
ant Bartholomew appeals. Affirmed.

*Rosenburg, Painter & Stanton,* for plaintiff.

*Robert Crary* and *Robert Crary, Jr.,* for defend-
ant.

CARR, J. Plaintiff, as special administrator of the
estate of Emma J. Allison, brought this suit in
equity for the purpose of obtaining rights to ac-

counts with the defendant savings and loan associations, and also for the recovery of money withdrawn by defendant Bartholomew, after the death of decedent, from the First Federal Savings & Loan Association of Saginaw. The death of Mrs. Allison occurred on December 3, 1953. She was at the time 87 years of age. A will executed in 1951 left bequests to defendant Bartholomew, who was her nephew, and to other relatives. At the time the will was executed Mrs. Allison was living in the home of Miss Anna Mae Beuter.

Following the death of Miss Beuter in the spring of 1953, plaintiff's decedent went to the home of a niece where she remained until July 4th. At that time she went to Saginaw to stay with defendant and his wife. She had at the time accounts in the defendant savings and loan associations approximating the sum of $11,000. She also had funds in the Jackson City Bank & Trust Company in an amount somewhat in excess of $3,000. On or about July 15, 1953, the money in the Jackson bank was withdrawn and an account was opened therewith in the Saginaw savings and loan association above mentioned, said account being in the names of Mrs. Allison and Mr. Bartholomew, hereinafter referred to as the defendant. It is the claim of plaintiff that this account was opened in the manner indicated in order to facilitate the making of expenditures on behalf of Mrs. Allison, with whose funds said account was established.

On August 19, 1953, Mrs. Allison was removed to the home of a grandniece, Mrs. Helen Polanis, who resided in Jackson. The reasons for such removal are not of particular significance in the case. The record discloses that on the following day Mrs. Allison fell on a stairway, as a result of which she suffered several fractured ribs. She was placed in a chair by those present, and attempts were made to obtain medical assistance for her. The services of

an osteopathic physician were finally procured. An examination was made which indicated the fractured ribs, and Mrs. Allison was placed in bed. Prior thereto, however, and before any treatment had been given to Mrs. Allison, defendant came to the Polanis home, remained there a short time, and then left. On his return he had forms claimed to have been procured by him from the defendant savings and loan associations, to which forms Mrs. Allison, after defendant had talked to her for a few minutes, affixed her signature. The record in the case indicates that thereafter the defendant completed the said forms by inserting his name therein, thus creating instruments that ostensibly placed the accounts in the defendant associations in the names of Mrs. Allison and defendant, with rights of survivorship. At the request of said defendant, Mr. and Mrs. Polanis affixed their signatures to each form as witnesses. Thereafter each instrument was presented to the savings and loan association having the account referred to therein.

Plaintiff alleged in the bill of complaint that at the time of the transactions above mentioned Mrs. Allison was mentally incompetent to understand and appreciate their nature and purpose, that each account in question was placed in the names of Mrs. Allison and defendant in order to facilitate withdrawals therefrom for the use and benefit of the former, and that the signatures of Mrs. Allison on the forms signed by her on August 20th were obtained by fraud and undue influence. On the trial of the case testimony was offered with reference to the mental condition of Mrs. Allison at the time of the transactions in question, and also with reference to the facts and circumstances surrounding the occurrences of August 20, 1953, in the Polanis home.

The trial judge, after listening to the proofs of the parties, came to the conclusion that the account

with the First Federal Savings & Loan Association of Saginaw was opened in the form indicated in order to facilitate its handling, and withdrawals therefrom for the benefit of Mrs. Allison, and that the instruments ostensibly executed on August 20, 1953, were filled out after she had signed, without any showing on behalf of defendant that he was authorized to insert his name therein. It was further declared in the opinion filed that defendant Bartholomew occupied a fiduciary and confidential relationship with his aunt, and that, in consequence, the burden rested on him to explain the transactions in question and to establish the good faith thereof. The claim that Mrs. Allison was mentally incompetent to transact business of the nature involved was considered, but no specific finding was made with reference thereto. Based on the conclusion indicated, however, a decree was entered in plaintiff's favor, declaring the rights of the estate in and to the accounts in the savings and loan associations and, also, its right to receive from defendant the balance in the account with the Saginaw association, which balance was withdrawn by defendant after the death of Mrs. Allison, the amount of such withdrawal being the sum, as disclosed by exhibits filed with this Court, of $936.90. From the decree entered, defendant has appealed, claiming that the proofs in the case did not establish plaintiff's right to the relief granted, that certain testimony to which objections were made and overruled was erroneously admitted, and that the pleadings did not present the issue as to the inherent validity of the instruments executed on August 20, 1953.

This being an equity case we hear it *de novo* on the record made in the trial court. The primary question for consideration is whether the proofs established that at the time of the transactions involved in the controversy Mrs. Allison was mentally incom-

petent to such an extent as to render her incapable of understanding the nature and purpose of her acts. As before noted, she was at the time of her death in December, 1953, 87 years of age. The record indicates she suffered from the physical and mental infirmities incident to old age aggravated by ill health.

In support of the averments of the bill of complaint plaintiff introduced the testimony of Dr. E. F. Lewis, a practicing physician of the city of Jackson, who was Mrs. Allison's physician from December, 1927, until her death in 1953. The witness testified that he had seen her several times each year. When he was first called to administer to her he discovered that she was suffering from a disease, progressive in nature, which in its final stages affects the brain and nervous system, resulting in paresis. The witness stated that during the years that he had been Mrs. Allison's physician he had observed a gradual mental deterioration on her part. As a result of her physical condition the patient became mentally depressed, the situation being complicated by high blood pressure. The physician further stated that in his opinion she was suffering from degeneration of the brain in June, 1953, and that such condition was one that would not thereafter improve but would, on the contrary, become worse. The following question and answer fairly summarize the testimony of the witness on the matter in question:

"*Q.* Doctor, will you state whether or not in your opinion, based on your knowledge of Mrs. Allison, your observation of her, your treatment of her, based upon her condition when you last saw her in June of 1953 up until the next time you saw her in September of 1953, will you state whether or not in your opinion during that period of time, that interval between June and September, whether or not Mrs. Allison was mentally competent to transact business? * * *

"*A.* My opinion, she wouldn't be competent."

The witness gave further testimony as to the probable effects of the fall suffered by Mrs. Allison on August 20, 1953, indicating that in his opinion her condition was aggravated thereby. Defendant offered the testimony of the osteopathic physician who was called to minister to Mrs. Allison following her fall on the date mentioned. He stated, in substance, that as a result of his examination he made a tentative diagnosis of fractured ribs and also discovered that she had heart trouble. The witness further testified on cross-examination that Mrs. Allison might properly have been described as a senile individual, and that she was in pain when he visited her at the Polanis home.

On August 25th following her fall Mrs. Allison was removed to a hospital where she was under the care of the physician, and witness, who examined her on the afternoon of August 20th. The entries made in the record of her case indicated that the patient was, on admission to the hospital, in a serious condition, that she was incoherent, unable to cooperate in treatments sought to be administered to her, and could not orient herself with reference to her surroundings. It may be noted also that the witness testified that when he saw Mrs. Allison in the Polanis home she was in very bad condition, and that it was his opinion that death might occur at any time. A reading of the testimony of this witness suggests that he was not particularly concerned, at the time he first saw Mrs. Allison on August 20, 1953, with her mental condition.

Plaintiff administrator also testified in the case, stating in substance that he had known Mrs. Allison for a considerable period of time, that he had represented her in a legal capacity, that he had prepared a will, or wills, at her request, and that in a general way he knew her physical and mental condition. He stated, in substance, that following the death of Miss

Beuter he prepared a claim for Mrs. Allison to file against the estate for services rendered, that he tried to explain to her the purpose of such claim, and that she did not seem to be able to understand what he meant, although he went over it several times using as simple language as possible. Apparently the last contact of the witness with Mrs. Allison, prior to her hospitalization, was on May 6, 1953. In answer to the question as to his opinion with reference to her mental competency at that time he answered, in substance, that he considered her incompetent, particularly to engage in transactions that involved the signing away of any of her property, or business matters of like nature.

On behalf of defendant the depositions of several witnesses were introduced, on the issue of mental competency, each deposition indicating, however, that the deponent had had merely casual contact with Mrs. Allison, the contacts not being numerous or of such character as to involve any business transactions or to arouse questions concerning her mental condition. The trial judge in his opinion referred to the fact that defendant's witnesses on the issue had only a "brief acquaintance" with Mrs. Allison during the period that she was in Saginaw. The opinion further indicated that the weight of the evidence relating to the matter of competency was in favor of plaintiff's claims.

The undisputed proofs as to what occurred in the Polanis home on August 20, 1953, clearly indicate that Mrs. Allison was not at that time in a condition, either mentally or physically, to engage in business transactions involving the disposition by her of property rights. That she was in serious pain is not disputed. The testimony of Mr. Polanis, who was in the room at the time the instruments above mentioned were signed, discloses that defendant talked to Mrs. Allison in a low tone of voice for sev-

eral minutes prior to the signing, the witness, who was only 10 feet away, being unable to hear what was said. It is not disputed that at the time Mrs. Allison's hearing was defective. Coupled with the proofs as to her general condition and mental ability, the conclusion may not be avoided that she was, at the time she affixed her signatures to the forms obtained from the savings and loan associations, incompetent to engage in business transactions affecting her property rights. Plaintiff is entitled to the relief sought with reference to the accounts in the Jackson associations on that ground. Whether such result might properly be based on the determination of other issues raised in the case does not require discussion. ·

The right of plaintiff to recover from defendant Bartholomew the sum withdrawn by the latter from the account with the Saginaw association may likewise be sustained on the ground of a lack of mental competency on the part of Mrs. Allison at the time the account was opened on July 15, 1953. The testimony above referred to, by her physician and by her attorney, each of whom had known her for many years and had occasion to be concerned with her mental condition, clearly supports such conclusion. However, the record fully justifies the finding of the trial judge that the purpose of opening the Saginaw account in the names of Mrs. Allison and defendant was to facilitate withdrawals therefrom for the benefit of the former. It is undisputed that moneys from the account were used during her lifetime solely for her benefit and for the payment of her obligations. Apparently some withdrawals for such purposes were made after her death. The course of conduct was such as to clearly indicate the understanding of the defendant with reference to the character of the account. Without reference to Mrs. Allison's ability to understand the nature of the transaction, it is

obvious that defendant did so and acted accordingly. Significant also in this regard is the undisputed testimony of the plaintiff with reference to a conversation between himself and defendant after Mrs. Allison's death. The following excerpt from such testimony fairly indicates the nature of the conversation, and the admissions made therein by defendant Bartholomew:

"He wrote me a letter in regard to paying the funeral bill which I have here in regard to the bank account and in regard to paying the funeral bill. It was—it was our understanding when Kenneth left the day he turned over the assets that he would keep the Saginaw book because that account had been specifically transferred to him, I believe, from some bank—not building and loan—some bank in Jackson when Mrs. Allison went to Saginaw, so that Kenneth would have funds to take care of her needs up there; and he had paid considerable out of the account for her proper needs; and when he left, the understanding was that he would take that book, use the funds to take care of the bank—the funeral expenses and whatever other incidental expenses there might be that we don't have. Mr. Bartholomew had paid the bills which had accrued from her injury to the date of her death out of that account."

Mr. Bartholomew did not take the stand for the purpose of testifying with reference to what was said in his conversation with plaintiff on the occasion referred to in the latter's testimony. On the record before us it may fairly be assumed that he by his conduct both before and after the death of Mrs. Allison recognized the nature and purpose of the account with the Saginaw savings and loan association. The trial judge came to the correct conclusion in this respect, and the provision of the decree with reference to the moneys withdrawn from said account by Mr. Bartholomew after her death, and for pur-

poses other than the payment of bills incurred by her or in her behalf, may be sustained on the ground set forth by the trial judge in his opinion, as well as on the basis of a lack of mental competency on her part.

On behalf of defendant Bartholomew objections were made on the trial in circuit court to plaintiff's testifying to matters claimed to have been equally within the knowledge of the deceased, said objections being based on CL 1948, § 617.65 (Stat Ann § 27.914). The section cited, insofar as material here, provides as follows:

"When a suit or proceeding is prosecuted or defended by the heirs, assigns, devisees, legatees, or personal representatives of a deceased person, the opposite party, if examined as a witness in his own behalf, shall not be admitted to testify at all to matters which, if true must have been equally within the knowledge of such deceased person."

It may be questioned if plaintiff testified to any material matters equally within the knowledge of Mrs. Allison in her lifetime. There is nothing to indicate that she was aware of her mental condition. In any event the objections made were not well-founded. In *Freda* v. *Tishbein*, 174 Mich 391 (49 LRA NS 700), the plaintiff, as special administratrix, brought an action of replevin to recover certain personal property claimed to belong to the estate. Objection was made to her testimony on the basis of the statutory provision above quoted. In holding the testimony competent, it was said (p 393):

"It should be borne in mind that the plaintiff represents the estate of the decedent. We do not think that this statute renders the personal representative incompetent to testify in behalf of the estate as to matters within the decedent's knowledge. Unless objectionable upon other grounds than the one here urged, it was competent for the plaintiff to testify to matters equally within the knowledge of

decedent. The present case is not one in which a claim is presented against an estate. This is simply a suit to determine who had the right to the possession of these goods a few weeks after the death of decedent, whether the administratrix or the defendants, and we think it was competent for the plaintiff to testify to any fact in connection with the possession of decedent. In other words, the estate is in no sense an opposite party, and the plaintiff represents the estate. *Moore* v. *Machen*, 124 Mich 216. The above case holds that this statute does not render the personal representative incompetent to testify in behalf of the estate as to matters within the decedent's knowledge."

*Salsbury* v. *Sackrider*, 284 Mich 493, was an action in equity for specific performance of an oral contract which plaintiff claimed to have made with her father in his lifetime. Defendants were the executors under the will of the father. The question as to their right to testify and the view of the Court with reference thereto is suggested by the following language of the opinion (pp 496, 497) :

"Plaintiff named as defendants, among others, Fred T. Sackrider, individually and as executor, and Everett C. Sackrider as executor. The latter, a son of deceased, was sworn as witness on plaintiff's behalf and testified that some time after the death of his mother, deceased had told him that he had entered into the contract with plaintiff, which was previously testified to. Fred T. Sackrider was called as a defendant and cross-examined under the statute. The testimony of these 2 witnesses was objected to on the part of defendants, Fred T. Sackrider and his wife, on the ground that it related to matters equally within the knowledge of the deceased.

"The administrator of an estate is not an 'opposite party' within the meaning of the statute, and is not precluded from testifying in a suit by a claimant against an estate. *In re Refior's Estate*, 236 Mich 5. An opposite party within the meaning of the statute

is one whose personal and financial interests, either immediate or remote, are antagonistic to the like interests of the protected party. *Hayes* v. *Skeman*, 269 Mich 473. The testimony objected to by defendants was properly admitted by the trial court."

See, also, *Pence* v. *Wessels*, 320 Mich 195.

Appellant cites and relies on *Tackaberry* v. *Monteith*, 295 Mich 487. That case was a suit in equity to determine the ownership of certain real property that had been formerly owned by Caroline Monteith. Apparently Mrs. Monteith had in her lifetime executed a quitclaim deed, under date of March 29, 1932, purporting to convey the property to her son Fred Monteith, defendant in the case. Prior thereto, and under date of April 5, 1918, she had executed a conveyance to plaintiff's father, John S. Monteith, who was deceased at the time the case was brought. Plaintiff sued as administratrix of the estate of her grandmother, and, also, as administratrix of the estate of her father and as his heir at law. It thus appears that both parties to the action were claiming under conveyances from plaintiff's grandmother. Defendant objected to plaintiff's testimony on the theory that he was in the position of an assignee of the deceased, and that plaintiff as an heir at law of John S. Monteith was an opposite party in interest. The Court indicated that appellant's interpretation of the statute (above quoted in part) was correct, holding, however, that defendant had waived the right to object by testifying to matters equally within the inhibition of the statute. The case may be differentiated from the instant controversy on the basis of the factual situation involved. Under authority of the cases cited, and other decisions of like import, the objection to plaintiff's testimony in the case at bar was not well-founded. The trial court was not in error in receiving the answers to the questions to which counsel for defendant objected.

Other questions in the case do not require discussion. The decree of the trial court is affirmed, with costs to appellee.

DETHMERS, C. J., and SHARPE, SMITH, EDWARDS, VOELKER, KELLY, and BLACK, JJ., concurred.